GREENE COUNTY PLANNING BOARD, Petitioner,

v.

FEDERAL POWER COMMISSION. Respondent.

Town of Durham, New York and Association for the Preservation of Durham Valley, Power Authority of the State of New York, the Sierra Club, Intervenors.

TOWN OF DURHAM, NEW YORK AND ASSOCIATION FOR the PRESERVATION OF DURHAM VALLEY, Petitioners,

v.

FEDERAL POWER COMMISSION, Respondent.

Nos. 434, 435, Dockets 71–1991, 71–1996.

United States Court of Appeals, Second Circuit.

Argued Dec. 16, 1971.

Decided Jan. 17, 1972.

**414**

Neil E. Needleman, Glens Falls, N. Y.
(Robert J. Kafin, Kafin & Needleman,
Glens Falls, N. Y., of counsel), for peti-
tioner Greene County Planning Board.

Barry H. Garfinkel, New York City
(Kurt Koegler, Robert Hermann, New
York City, Charles R. Halpern, Geoffrey
Cowan, Washington, D. C., of counsel),
for petitioners Town of Durham and As-
sociation for Preservation of Durham
Valley.

Platt W. Davis, III, Atty., Washington,
D. C. (Gordon Gooch, Gen. Counsel, Leo
E. Forquer, Sol., J. Richard Tiano, First
Asst. Sol., of counsel), for respondent
Federal Power Commission.

Scott B. Lilly, New York City (Thom-
as F. Moore, Jr., John R. Davison, New
York City, John C. Mason, Washington,
D. C., of counsel), for intervenor Power
Authority of State of New York.

Alfred S. Forsyth, New York City, for
intervenor Sierra Club.

Before SMITH, KAUFMAN and MUL-
LIGAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit
Judge:

We are called upon to assess the licens-
ing procedures of the Federal Power
Commission in a proceeding upon the ap-

plication [1] of the Power Authority of the State of New York (PASNY) for authorization to construct a high-voltage transmission line. Although the petitioners—Greene County Planning Board, the Town of Durham, New York, and the Association for the Preservation of Durham Valley—raise several interesting arguments, the dispute centers on compliance with the procedural mandates of Section 102(2) (C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C.A. § 4332(2) (C), which requires all federal agencies to issue a "detailed statement" on the environmental impact of all "major Federal actions significantly affecting the quality of the human environment . . ." This section is an essential "action forcing" provision [2] in legislation designed "[t]o declare a national policy which will encourage productive harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality." [3] NEPA § 2, 42 U.S.C.A. § 4321. In addition, petitioners ask us to decide that the Commission has discretion in the public interest, to pay the attorneys' fees and other expenses of the intervenors in the proceedings. We find that the Commission has not complied with NEPA and remand for further proceedings, but under the circumstances presented to us, we refuse to order the Commission or PASNY to pay the expenses and counsel fees of the private intervenors.

A brief statement of the proceedings thus far will aid in comprehending the arguments advanced. On August 15, 1968, PASNY filed an application to construct, operate and maintain a 1,000,000 kilowatt pumped storage power project [4] along the middle reaches of Schoharie Creek in the towns of Blenheim and Gilboa, New York, some forty miles southwest of Albany. The project as proposed, *inter alia*, consisted of: (1) an

1. Application was made pursuant to Section 4(e) of the Federal Power Act, 16 U.S.C. § 797(e), which provides in pertinent part:

The Commission is hereby authorized and empowered—

\* \* \* \* \*

(e) To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized under the laws of the United States or any State thereof, or to any State or municipality for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, or upon any part of the public lands and reservations of the United States (including the Territories), or for the purpose of utilizing the surplus water or water power from any Government dam. . . .

2. *See* S.Rep.No.91–296, 91st Cong., 1st Sess. 20 (1969); Environmental Quality, the Second Annual Report of the Council on Environmental Quality ch. 5 (Aug. 1971), reprinted in 1 Environmental L. Rep. 50057, 50064 [hereinafter cited as *CEQ Report*].

3. *See generally* Hanks & Hanks, An Environmental Bill of Rights: The Citizen Suit and the National Environmental Policy Act of 1969, 24 Rutgers L.Rev. 230 (1970); Peterson, An Analysis of Title I of the National Environmental Policy Act of 1969, 1 Environmental L.Rep. 50035.

4. A pumped storage power facility is designed to provide energy during the hours of peak kilowatt demand. The functioning of such a facility is explained in our decision in Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608, 612 (2d Cir. 1965), cert. denied *sub nom.* Consolidated Edison Co. of New York v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). *See also* Loving, A Vast New Warehouse for Electricity, Fortune 88 (Dec. 1971).

upper reservoir; (2) a lower reservoir (including a dam across Schoharie Creek); (3) an outdoor powerhouse and (4) three 345 kilovolt transmission lines —one from the switchyard adjacent to the powerhouse to a substation at New Scotland, one to a substation at Fraser and the last to a substation at Leeds.[5] After consulting with several federal agencies, the Commission granted the license. Power Authority of the State of New York, Project No. 2685, 41 F.P.C. (June 6, 1969). Article 34 of the license, however, specifically prohibited construction of the transmission lines until further Commission approval was given to "plans for preservation and enhancement of the environment as it may be affected by the transmission lines design and location." [6] *Id.* at 718. In preparing the plans, PASNY was required to "give appropriate consideration to recognized guidelines for protecting the environment and to beneficial uses, including wildlife, of the transmission lines right-of-way." *Ibid.*

PASNY applied for construction authorization of the three lines on November 24, 1969. When no protests or petitions were filed with respect to the Gilboa-New Scotland and Gilboa-Fraser lines, the Commission approved construction of these two lines without holding a hearing. Power Authority of the State of New York, Project No. 2685, 43 F.P.C. 521 (April 10, 1970). Nevertheless, the Commission, after conducting a full inspection and conferring with PASNY's staff and consultants, "concluded that from an aesthetic and environmental val-

ues point of view, the selected locations of the two lines involved herein are preferable to all of the alternative routings that were considered." *Id.* at 522–523.

The Commission, however, received several protests with respect to the Gilboa-Leeds line which was to run from the project in Schoharie County, through the Durham Valley, past the town of Durham (in Greene County) to the Leeds Substation less than two miles from the Hudson River near Catskill. Motions to intervene were filed by the Greene County Planning Board, the Town of Durham, the Association for the Preservation of the Durham Valley,[7] the Sierra Club and several individuals.[8] Intervention was granted on May 19, 1970, but participation was limited to the issues raised in the petitions to intervene—namely, the impact of the line on the Durham Valley in particular and Greene County in general.

NEPA became effective on January 1, 1970, after PASNY applied for the transmission line permits, but before the permits were issued for the Gilboa-New Scotland and Gilboa-Fraser lines. It was not until almost a year later, on December 2, 1970, that the Commission issued Order No. 415 to implement procedures in accord with NEPA. 18 C.F.R. §§ 2.80–.82 (January 1, 1971). Section 2.81 (b) of the regulations required each applicant for a license for a "major project" to file its own detailed statement of environmental impact developing fully the five factors listed in section 102(2) (C) of NEPA.[9] Although the regula-

---

5. Exhibit R to PASNY's application proposed a recreational use plan including overlook areas and a State Park.

6. Other restrictions on the license included provisions for flood control, additional studies with respect to fish and wildlife resources, protection for the covered Blenheim Bridge and development of a plan to blend the project works with the natural view.

7. The Association is a voluntary, unincorporated, nonprofit association organized in 1969 to protect and preserve the scenic, historical and ecological values of the

Durham Valley area. In January, 1970, the Association had over 100 members who in the aggregate owned more than 5,000 acres of land in Durham Valley and its immediate vicinity.

8. The individual intervenors own land in the Durham Valley.

9. The five factors are:
(i) the environmental impact of the proposed action.
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented.

tions required the Commission staff to prepare a detailed statement in the case of all uncontested applications, no such statement was required where applications were contested.[10] *See* 18 C.F.R. §§ 2.81(e)–(f) (January 1, 1971).

In accordance with Commission regulations, PASNY filed its impact statement on March 26, 1971, covering the proposed Gilboa-Leeds line and two alternative routings. The Commission reviewed the statement as to sufficiency of form, *see* 18 C.F.R. § 2.81(b) (January 1, 1971), and then circulated it for comment to agencies with "special expertise with respect to any environmental impact involved."[11] *See* NEPA § 102 (2) (C) 42 U.S.C.A. § 4332(2) (C).

Finally, by order issued May 4, 1971, the Commission ordered a hearing on PASNY's proposals and set a prehearing conference for June 22, 1971. At this conference, Durham and Greene County moved that PASNY, or alternatively the Commission, pay the expenses and fees, including attorneys' fees, incurred by the intervenors in the proceeding. Greene County also requested the Presiding Examiner to set a date for the Commission to file its own impact statement pursuant to NEPA. Then, by motions filed July 6 and July 12, 1971, the intervenors moved for an order vacating, rescinding or suspending the June 6, 1969, license of the entire project and enjoining further construction, alleging that the Commission did not comply with the notice requirements of the Federal Power Act and the mandates of NEPA.[12]

The Presiding Examiner denied each of the motions, and the movants filed timely notices of appeal to the Commission. *See* 18 C.F.R. § 1.28 (January 1,

---

(iii) alternatives to the proposed action.

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

10. Under Section 2.81(e) (1), the Commission staff was expected to "specifically analyze and evaluate the evidence in the light of the environmental criteria . . . ."

The Commission revised its rules by Order No. 415–B, issued November 19, 1971. 36 Fed.Reg. 22738 (Nov. 30, 1971). Section 2.81 no longer requires the Commission to prepare its own statement in uncontested proceedings.

11. The statement was circulated to the Hudson River Valley Commission, the Secretary of the Interior, the Secretary of Agriculture, the Army Corps of Engineers, the New York Department of Environmental Conservation and the Environmental Protection Agency.

12. Intervenors made several motions, either orally or in writing, which are not recounted here, since they were merely variations of the theme we already have presented.

Intervenors, however, unsuccessfully moved that they be provided copies of the transcript without charge, that their non-expert witnesses be allowed to testify orally without first filing written testimony, and that the hearings be held in Greene County. The Commission denied appeals from the Presiding Examiner's decisions, noting that it is within his discretion to determine procedural matters relating to the hearings. Although petitioners preserved their objections to the Presiding Examiner's decisions by petitioning for review of the Commission's orders, they have not raised these issues on appeal. Nevertheless, we are constrained to note that the Commission at nearly every turn has made it difficult procedurally for the intervenors. For example, intervenors were forced to go to court to compel disclosures under the Freedom of Information Act. *See* Town of Durham v. Federal Power Commission, 71 Civ. 3993 (S.D.N.Y. Oct. 26, 1971). We suggest that the Federal Power Commission, as well as other Federal Agencies, must review their rules and rethink encrusted, entrenched positions in light of the provision in NEPA that, "to the fullest extent possible," all regulations of the agencies must be interpreted and administered in accordance with the policies of the Act. NEPA § 102(1), 42 U.S.C.A. § 4332(1). We fully agree wih the Council on Environmental Quality that compliance is required not only with the letter, but the spirit of the Act. Council on Environmental Quality, Guidelines § 1, 36 Fed.Reg. 7724 (April 23, 1971).

1971). Although each appeal was denied *sub silentio* by operation of law,[13] the Commission granted rehearings and by orders dated October 28 and 29, 1971, it formally denied the appeals. Petitioners ask us to review those orders. *See* Federal Power Act § 313, 16 U.S.C. § 825*l*.

Before passing to the merits of petitioners' contentions, we note that the latest round of hearings commenced on November 9, 1971. Petitioners moved for a stay of these hearings in this Court, but the motion was denied on November 1. To date, the hearings have been concerned with cross-examination of PASNY and Commission witnesses. They are expected to continue for several months. In addition, the entire project, exclusive of the Gilboa-Leeds transmission line, *is* now more than 80% complete.[14]

## I. COMPLIANCE WITH NEPA

### A. *Gilboa-Leeds Transmission Line*

Section 102(2) (C) of NEPA, as we stated at the outset, requires every federal agency to "include in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment" a detailed environmental impact statement. Prior to making the statement, the agency must "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." The detailed statement, however, *"must accompany the proposal through the existing agency review processes . . . ."* [15] (Emphasis added.)

■ It is conceded that authorization of the Gilboa-Leeds line, an integral part of the Blenheim-Gilboa Project, would constitute a major federal action. The parties, however, are in vigorous disagreement over when the Commission must make its impact statement. The Commission argues that PASNY's statement, reviewed as to form by the Commission and circulated by it, suffices for the purposes of Section 102(2) (C) and that the Commission is not required to make its *own* statement until it files

---

13. Section 1.28(c) of the Commission's rules provides in part:

(c) *Commission action.* Unless the Commission acts upon questions referred by presiding officers to the Commission for determination or upon appeals taken to the Commission from rulings of presiding officers within thirty days after referral or filing of the appeal, whichever is later, such referrals or appeals shall be deemed to have been denied.

14. We are told that more than 75% of the estimated $160,000,000 total cost has been spent or committed.

15. Section 102(2) (C) provides in full:

Sec. 102. The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall—

\* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes.

its final decision. Petitioners argue that the Commission must issue its statement prior to any formal hearings. PASNY, perhaps recognizing that the Commission's position is untenable, but nevertheless anxious to expedite the proceedings, proposes a third course of action. It urges that the Commission can draft its statement on the basis of the hearings, but to be circulated by it for comment before its final decision. It is clear to us that petitioners offer the correct interpretation.

Section 101(a) of NEPA, 42 U.S.C.A. § 4331(a), declares that "it is the continuing policy of the Federal Government . . . to use all practicable means and measures . . . in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." To this end the government must "coordinate Federal plans, functions, programs, and resources. . . ." NEPA § 101(b), 42 U.S.C.A. § 4331(b). As long as six years ago, this Court remanded a case to the Commission because, in granting à license for the construction of a similar pumped storage power project at Storm King Mountain on the Hudson River, it had failed to weigh the factors of "the conservation of natural resources, the maintenance of natural beauty, and the preservation of historic sites." [16] Scenic Hudson Preservation Conference v. Federal Power Commission [Scenic Hudson I], 354 F.2d 608, 614 (1965), cert. denied

*sub nom.* Consolidated Edison Co. of New York v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). We commented there: "In this case, as in many others, the Commission has claimed to be the representative of the public interest. This role does not permit it to act as an umpire blandly calling balls and strikes for adversaries appearing before it; the right of the public must receive active and affirmative protection at the hands of the Commission." *Id.* at 620. But NEPA, which was a response to the urgent need for a similar approach in all federal agencies,[17] went far beyond the requirement that the agency merely consider environmental factors and include those factors in the record subject to review by the courts.

In addition to the environmental impact statement, Section 102(2) requires the agency, *inter alia*, to:

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planing and in decisionmaking which may have an impact on man's environment;

\* \* \* \* \* \*

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

\* \* \* \* \* \*

16. The decision was based upon Section 10(a) of the Federal Power Act, 16 U.S.C. § 803, which provides:
All licenses issued under this Part shall be on the following conditions:
(a) That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of waterpower development, and

for other beneficial public uses, including recreational purposes; and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval.
*See also* Udall v. Federal Power Commission, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967).

17. *See* Hanks & Hanks, *supra* note 3, at 265–269.

(E) recognize the worldwide and long-range character of environmental problems . . . .

We view this section as did the District of Columbia Circuit. It is a mandate to consider environmental values "at every distinctive and comprehensive stage of the [agency's] process." The primary and nondelegable responsibility for fulfilling that function lies with the Commission. Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 449 F.2d 1109, 1119 (D.C. Cir. 1971) (holding that rules of the AEC which did not require a detailed statement in an uncontested licensing proceeding did not comply with Section 102(2) (C)).

■ The Federal Power Commission has abdicated a significant part of its responsibility by substituting the statement of PASNY for its own. The Commission appears to be content to collate the comments of other federal agencies, its own staff and the intervenors and once again to act as an umpire.[18] The danger of this procedure, and one obvious shortcoming, is the potential, if not likelihood, that the applicant's statement will be based upon self-serving assumptions.[19] In fact, PASNY's statement begins: "Neither the construction nor the operation of the Gilboa-Leeds transmission line will have any significant adverse impact on the environment." But, the Gilboa-Leeds line, if constructed as proposed, will cut a swath approximately 35 miles long and 150 feet wide across the face of Greene and Schoharie Counties. It is small consolation that the line will not scar either existing historical sites or designated park land.

■ Moreover, although decisions like Scenic Hudson I have greatly expanded the concept of standing to challenge administrative action,[20] intervenors generally have limited resources, both in terms of money and technical expertise, and thus may not be able to provide an effective analysis of environmental factors.[21] It was in part for this reason that Congress has compelled agencies to seek the aid of all available expertise and formulate their own position early in the review process. The Commission argues, however, that written testimony of its staff demonstrates that the Commission has not left the applicant and the intervenors to develop the record. It insists that its staff has undertaken field research in an effort to investigate alternatives proposed by PASNY and also any additional feasible alternatives. It is clear to us that this testimony cannot replace a single coherent and comprehensive environmental analysis, which is

---

18. The Commission did not face squarely the issue of compliance with NEPA in its orders. In upholding the Presiding Examiner's refusal to delay the hearings until the Commission had prepared its statement, the Commission said:
   . . . they [Durham and Greene County] simply ask the Commission to reconsider that which the Presiding Examiner found to be not in the public interest. For the reasons given in connection with the preceding appeal [the Presiding Examiner has broad discretion over hearing procedures], reconsideration of such procedural matter will be denied . . . .

19. Cf. Scenic Hudson I, 354 F.2d at 619: "self-serving general statements by officials of Consolidated Edison . . . ."

20. See, e. g., Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97 (2d Cir.), cert. denied, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970). See generally Hanks & Hanks, supra note 3, at 231–244; Peterson, supra note 3, at 50047–48.

21. See Calvert Cliffs', 449 F.2d at 1118–1119 ("It is, moreover, unrealistic to assume that there will always be an intervenor with the information, energy and money required to challenge a staff recommendation which ignores environmental costs."); Gellhorn, Public Participation in Administrative Hearings, Report Prepared for the Committee on Agency Organization and Procedure of the Administrative Conference of the United States 29–37 (October 29, 1971).

itself subject to scrutiny during the agency review processes. If this course of action we approve were not followed, alternatives might be lost as the applicant's statement tended to produce a *status quo* syndrome.

The danger that the review process will bog down once an initial decision has been rendered is fully recognized by the Council on Environmental Quality[22] in Section 10(b) of its Guidelines suggesting procedures for compliance with NEPA, 36 Fed.Reg. 7724 (April 23, 1971):

> It is important that draft environmental statements be prepared and circulated for comment and furnished to the Council early enough in the agency review process before an action is taken in order to permit meaningful consideration of the environmental issues involved. To the maximum extent practicable no administrative action . . . is to be taken sooner than ninety (90) days after a draft environmental statement has been circulated for comment, furnished to the Council and . . . made available to the public . . . .

It is interesting that the Commission relies on these Guidelines to sustain its position. Initially, it directs us to Section 7 which would allow an agency, when it seeks the advice of other agencies pursuant to Section 102(2) (C), to circulate "(i) a draft environmental statement for which it takes responsibility or (ii) comparable information . . . ." And, Section 2.81(b) of the Commission's latest rules (issued after the Guidelines) provides that the applicant's draft statement "shall be deemed to be information comparable to an agency draft statement

pursuant to Section 7 of the Guidelines of the Council on Environmental Quality." The Commission then calls our attention to Section 10(e) of the Guidelines, which provides:

> Agencies which hold hearings on proposed administrative actions or legislation should make the draft environmental statement available to the public at least fifteen (15) days prior to the time of the relevant hearings except where the agency prepares the draft statement on the basis of a hearing subject to the Administrative Procedure Act and preceded by adequate public notice and information to identify the issues and obtain the comments provided . for in sections 6–9 of these guidelines.

The Commission argues that the proviso relieves it of its obligation to prepare an environmental statement prior to the licensing hearings and that the applicant's statement, "information comparable" to a statement of its own, sufficiently identifies the issues. Although the Guidelines are merely advisory and the Council on Environmental Quality has no authority to prescribe regulations governing compliance with NEPA, we would not lightly suggest that the Council, entrusted with the responsibility of developing and recommending national policies "to foster and promote the improvement of the environmental quality," NEPA § 204, 42 U.S.C.A. § 4344, has misconstrued NEPA. Although the Commission's interpretation of Section 10(e) of the Guidelines is superficially appealing, it flies in the face of Section 102(2) (C) of NEPA which explicitly requires the agency's *own* detailed statement to "accompany the proposal through the existing agency review processes." [23]

22. The Council was established pursuant to Subchapter II of NEPA, 42 U.S.C. § 4341 et seq. Its duties include assisting the President in the preparation of the annual Environmental Quality Report to be transmitted to Congress and conducting *investigations and developing programs* concerning environmental quality.

23. An alternative interpretation, and one we would deem acceptable under the Act, is that the agency may hold two hearings —one solely to gather information to aid the Commission in formulating its statements, the second to consider the merits of the license application.

It is interesting to note that the Council on Environmental Quality assumed that when the Commission circulated the PASNY report, it subsequently would circulate its own report. In its June 1971

There can be no question that the hearings on PASNY's application, ordered pursuant to Section 308 of the Federal Power Act, 16 U.S.C. § 825g, and Section 1.20 of the Commission's rules, 18 C.F.R. § 1.20 (January 1, 1971), constitute an existing agency review process.

■■ Though we conclude that the Commission was in violation of NEPA by conducting hearings prior to the preparation by *its staff* of its own impact statement,[24] we are of the view that it did not seek improperly the advice of other agencies on the basis of PASNY's application. Section 102(2) (C) compels the agency to seek this advice before preparing its statement. Section 102(1), however, directs that "to the fullest extent possible" regulations should be interpreted and administered in accordance with the policies of NEPA. In this regard, it would be instructive for the Commission to consult the rules of the Atomic Energy Commission, 36 Fed.Reg. 18071 (Sept. 9, 1971), promulgated after the decision in *Calvert Cliffs'* charged the AEC with a "crabbed interpretation of NEPA [which made] a mockery of the Act." 449 F.2d at 1117. The Atomic Energy Commission, although it still requires an applicant to submit its environmental report, prepares a draft report of its own in advance of seeking the advice of other federal agencies. Then, on the basis of comments received from these agencies and all interested parties, it prepares its final detailed statement, which

is offered in evidence at a contested hearing.

■ In light of our foregoing discussion, we must consider the most efficient procedure for ensuring that the policies of NEPA are implemented in Commission proceedings on the Gilboa-Leeds line. For the reasons we have set forth, we deem it essential that the Commission's staff should prepare a detailed statement before the Presiding Examiner issues his initial decision. Moreover, the intervenors must have a reasonable opportunity to comment on the statement. But, since the statement may well go to waste unless it is subject to the full scrutiny of the hearing process, we also believe that the intervenors must be given the opportunity to cross-examine both PASNY and Commission witnesses in light of the statement. "Often individuals and groups can contribute data and insights beyond the expertise of the agency involved." *CEQ Report,* 1 Environmental L.Rep. at 50059. We leave to the Commission to determine the most efficient procedure for meeting this mandate.

■ Fully recognizing that delay unfortunately is incident to our mandate and PASNY's claim that the Blenheim-Gilboa Project is a vitally needed power facility, we can only add our voice to that of the District of Columbia Circuit in *Calvert Cliffs'*: Delay is a concomitant of the implementation of the procedures prescribed by NEPA, and the spectre

---

official monthly bulletin the Council published the following notice of the PASNY report:

> Applicant's drafts. (These are not official FPC drafts. They will be followed by staff-prepared draft statements.) . . .

24. In its brief to this Court, the Commission argued that it would be in contravention of Section 8(a) of the Administrative Procedure Act, 5 U.S.C. § 557, which prohibits Commission participation in the decision-making process until the record is completely developed, if it were required to adopt a position in an environmental impact statement. Certainly no one has suggested that the detailed state-

ment prepared before the hearings must be prepared by the Commission members. It is sufficient for the purposes of NEPA if the statement is prepared by the Commission's staff on the basis of the staff's investigations. Counsel for the Commission conceded at oral argument that this procedure would not violate the APA. *See also* Section 6(d) of the Guidelines of the Council on Environmental Quality:

> Where an agency follows a practice of declining to favor an alternative until public hearings have been held on a proposed action, a draft environmental statement may be prepared and circulated indicating that two or more alternatives are under consideration.

of a power crisis "must not be used to create a blackout of environmental consideration in the agency review process." 449 F.2d at 1122. "It is far more consistent with the purposes of the Act to delay operation at a stage where real environmental protection may come about than at a stage where corrective action may be so costly as to be impossible." *Id.* at 1128.

The petitioners inform us also that the Commission has violated its comprehensive planning duties by not requiring PASNY to divulge in its environmental statement any plans it may have with respect to future power projects and transmission lines. PASNY has indicated that this line is part of a plan which may include an additional massive pumped storage hydroelectric project with attendant transmission lines. The Commission responds that its planning responsibility under Section 10(a) of the Federal Power Act, 16 U.S.C. § 803 (a),[25] does not require analysis of future projects which are not presented in license applications. PASNY adopts the benign position that it has disclosed the feasibility studies presently in progress[26] and that the Commission should take them into account in considering the Gilboa-Leeds line.

■ We cannot agree with petitioners that the Commission erred when it did not require PASNY to supplement its impact statement. NEPA places the onus of formulating the statement solely on the Commission, and, unless there is any indication that the Commission's procedures will not allow it to comply with its statutory duty this Court should defer to the Commission's discretion as to the proper information gathering techniques.

■ In an effort to avoid any confusion or misunderstanding on remand, we are constrained to comment on the Commission's planning responsibility. Under Section 10(a) of the Federal Power Act, the Commission cannot issue a license unless the project is "best adapted to a comprehensive plan . . . for the improvement and utilization of water-power development and for other beneficial public uses, including recreational purposes; . . . " In *Scenic Hudson I* we commented that the Commission's failure to inform itself of Consolidated Edison's future interconnection plans "cannot be reconciled with its planning responsibility under the Federal Power Act." 354 F.2d at 622. And, less than two years later, Justice Douglas writing for the Supreme Court in Udall v. Federal Power Commission, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967), made it clear that the Federal Power Act does not command the immediate construction of as many projects as possible and that the determination whether to license any one project "can be made only after an exploration of all issues relevant to the 'public interest,' including future power demand and supply, alternate sources of power, [and] the public interest in preserving reaches of wild rivers and wilderness areas. . . . " *Id.* at 450, 87 S.Ct. at 1724. Although these decisions may not have established long-range planning requirements,[27] they evi-

---

25. *See* note 16 *supra.*

26. PASNY is making a study to determine the physical, environmental and economic feasibility of constructing additional pumped storage facilities downstream from the Blenheim-Gilboa project.

27. The author of this opinion has suggested that:
   . . . a major share of the blame for the unnecessary delays and ineffectual public planning in the United States may be laid at the doorstep of fragmented government regulation of power development. We sorely lack a federal agency—with sufficient authority, power and purse to choose among the infinite patterns of potential development—responsible for planning and controlling the growth and dispersal of electric generating capacity over a realistically extensive span of space and time.
   Kaufman, Power for the People—and by the People: Utilities, the Environment and the Public Interest, 46 N.Y.U.L.Rev. 867, 872–873 (1971).

dence a clear intent that the Commission at least should consider all available and relevant information in performing its functions.

The Commission's "hands-off" attitude is even more startling in view of the explicit requirement in NEPA that the Commission "recognize the worldwide and long-range character of environmental problems" and interpret its mandate under the Federal Power Act in accordance with the policies set forth in NEPA. NEPA §§ 102(1), (2) (E), 42 U.S.C.A. §§ 4332(1), (2) (E). Any doubt about the intent of these provisions is obviated by the following statement in the Senate Report accompanying the Act:

"Environmental problems are only dealt with when they reach crisis proportions. Public desires and aspirations are seldom consulted. Important decisions concerning the use and the shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades." S.Rep.No.91–296, 91st Cong., 1st Sess. 5 (1969).

The Commission has indicated that the June 6, 1969, license of the Blenheim-Gilboa Project did not commit it to authorize construction of the Gilboa-Leeds line. But we fail to see how the Commission, if it is to fulfill the demanding standard of "careful and informed decisionmaking," *Calvert Cliffs'*, 449 F.2d at 1115, can disregard impending plans for further power development. For example, it may be that it would be proper to defer decision on the Gilboa-Leeds line until these plans were crystallized, particularly if there is a likelihood that future development might affect the optimum location of the line or even make

the line unnecessary. Although the basic defect of current planning and licensing processes is "the inevitably narrow scope of the decision the agency [has] to make: whether or not to license a single and specific [project]," [28] we cannot tolerate the Commission cutting back on its expanded responsibility by blinding itself to potential developments notwithstanding its lack of authority to compel future, alternate construction.

### B. Blenheim-Gilboa Project and Approved Transmission Lines

■ Petitioners ask us to stay construction of the pumped storage facility and the two approved transmission lines, now 80% complete, pending compliance with NEPA.[29] Although there can be no question that the Act applies to all major federal actions taken after January 1, 1970, despite the fact that construction of the project under consideration may have commenced prior to that date, *see, e. g., Calvert Cliffs'*, 449 F.2d at 1127–1129 (construction permit for nuclear facility granted prior to effective date, but operating license not yet issued); Environmental Defense Fund, Inc. v. Corps of Engineers, 325 F.Supp. 728, 743–749 (E.D.Ark.1971) (Gillham Dam to be built as part of on-going Millwood Reservoir project), we see no basis for applying NEPA retroactively [30] to the licensing of the basic project which became final nearly six months prior to the effective date of the Act. *See* Pennsylvania Environmental Council v. Bartlett, 315 F.Supp. 238 (M.D.Pa.1970).

With respect to the Gilboa-New Scotland and Gilboa-Fraser lines, however, there can be no question that the Commission failed to comply with NEPA. The lines were approved on April 10, 1970, but the Commission failed to issue the requisite detailed environmental

---

28. *Id.* at 872.

29. Petitioners before the Commission also challenged the license and the approval of the Gilboa-New Scotland and Gilboa-Fraser lines on the ground that the Commission did not comply with the notice provisions of the Federal Power Act, and

the lengthy order of October 28, 1971, deals solely with that point. Petitioners have not raised the objection here.

30. *See generally* Note, Retroactive Application of the National Environmental Policy Act of 1969, 69 Mich.L.Rev. 732 (1971).

statement. Nevertheless, we find no compelling basis for halting construction of the lines so far advanced and decline to reopen the authorization proceedings. It is of no small consequence that petitioners, having made timely motions to intervene, offered no objections to the construction of the two lines and did not petition this Court or the District of Columbia Circuit for review within 60 days as provided by Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b). Thus, construction of the lines began pursuant to a *final* order of the Commission. Although we might arrive at a different conclusion if there were significant potential for subversion of the substantive policies expressed in NEPA, *cf. Calvert Cliffs'*, 449 F.2d at 1121 n. 28, the Commission did require PASNY in submitting its plans to "give appropriate consideration to recognized guidelines for protecting the environment" [31] and also conducted its own independent investigation of alternative routings. Moreover, it would be unreasonable to expect instant compliance with all of the Act's procedural requirements, *see id.* at 1121, and there is no indication (as there is with respect to the Gilboa-Leeds line) of obstinate refusal to comply with NEPA. *Compare* Scenic Hudson Preservation Conference v. Federal Power Commission [Scenic Hudson II], 1970, 453 F.2d 463 (2d Cir. 1971).

## II. EXPENSES AND FEES

The petitioners' final request is for an order requiring PASNY, or in the alternative the Commission, to pay the expenses and fees incurred by petitioners. Recognizing as they do that a rule requiring reimbursement of all intervenors would be subject to abuse, they limit their request to reasonable out-of-pocket expenses, including fees for experts as they are incurred, and reasonable attorneys' fees at the conclusion of the proceedings before the Commission in the event that their participation is determined to have been in the public interest.

■ As we read the Commission's order of October 29, 1971, the Commission denied petitioners' motion for payment of fees on the ground that it had no authority to grant them. But, in an effort to buttress its argument that the petitions for review are in this regard untimely, the Commission now argues that it has foreclosed only the present award of fees and has left open the question of whether ultimately to award them when the proceedings have come to an end. Whether or not the Commission will entertain renewed motions at the close of its proceedings, we find that the petitions are timely and that this Court has jurisdiction to review the Commission's order.

Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b) provides that "[a]ny party to a proceeding under [the Act] aggrieved by an order issued by the Commission in such proceedings may obtain a review of such order . . . ." This language, unlike those provisions limiting review to "final orders," *see, e. g.*, Section 10(f) of the National Labor Relations Act, 29 U.S.C. § 160(f), seemingly would allow review of all Commission orders. But the courts, sensitive to the policies underlying the requirement of exhaustion of administrative remedies, have declined jurisdiction where the issues raised could be disposed of in review of a final Commission order without serious detriment to the rights of the parties. *See, e. g.*, Federal Power Commission v. Metropolitan Edison Co., 304 U.S. 375, 383–384, 58 S.Ct. 963, 82 L.Ed. 1408 (1938); Mid-America Pipeline Co. v. Federal Power Commission, 112 U.S.App.D.C. 42, 299 F.2d 126 (1962). Review is available, however, where an interlocutory order has "an

---

31. *See, e. g.*, Guidelines for the Protection of Natural, Historic, Scenic, and Recreational Values in the Design and Location of Right-of-Way and Transmission Facilities, Report of the Working Committee on Utilities of the President's Council on Recreation and Natural Beauty (Dec. 27, 1968), reprinted in Commissioner Bagge's concurrence in the June 6, 1969, license. 41 F.P.C. at 725.

impact upon rights and [is] of such a nature as will cause irreparable injury if not challenged." Amerada Petroleum Corp. v. Federal Power Commission, 285 F.2d 737, 739 (10th Cir. 1960) (interpreting the review provision of the Natural Gas Act, identical to Section 313(b) of the Federal Power Act). In Environmental Defense Fund, Inc. v. Ruckelshaus, 439 F.2d 584 (D.C.Cir. 1971), the District of Columbia Circuit, considering the Federal Insecticide, Fungicide, and Rodenticide Act, which provides for judicial review "[i]n a case of actual controversy as to the validity of any order" of the Secretary of Agriculture, stated that the applicable test is not whether there are further administrative proceedings available, but "whether the impact of the order is sufficiently 'final' to warrant review in the context of the particular case." *Id.* at 591. *See also* Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093, 1098–1099 (1970). In light of the new congressional mandates in NEPA, this test is particularly appropriate when agency action affects the environment.

In accordance with these precepts we find that the petitions are reviewable. Despite the Commission's argument that petitioners have made an inadequate showing of financial hardship, it is clear to us that a refusal to award petitioners expenses as they are incurred, particularly expenses related to production of expert witnesses, may significantly hamper a petitioner's efforts to represent the public interest before the Commission.[32] And, a retroactive award of experts' fees would be small consolation to a petitioner if the hearings are finished, the record is complete and these experts were not called because of inadequate funds.

▆▆ Having determined that the petition for review is timely, we find ourselves in agreement with the Commission's position that at this posture of the proceedings and under current circumstances, without a clearer congressional mandate we should not order the Commission or PASNY to pay the expenses and fees of petitioners, either as they are incurred or at the close of the proceedings.

Petitioners rely on two provisions of the Federal Power Act—Sections 309 and 314(c), 16 U.S.C. §§ 825h, 825m(c)—and buttress their interpretations of those sections with the mandate in Section 102(1) of NEPA that all public laws, "to the fullest extent possible," should be interpreted in accordance with national environmental policies. Section 309 empowers the Commission "to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of [the Federal Power Act]." Although this section, which carries the title "Administrative powers of Commission; rules, regulations, and orders," is not restricted to "procedural minutiae," Niagara Mohawk Power Corporation v. Federal Power Commission, 126 U.S.App.D.C. 376, 379 F.2d 153, 158 (1967) (FPC empowered to backdate a license), we perceive no basis in the terms of the provision to extend the Commission's power to include paying or awarding the expenses or fees of intervenors. We would need a far clearer congressional mandate to afford the relief requested, especially in dealing with counsel fees, when Congress has not hesitated in other circumstances explicitly to provide for them when to do so was in the public interest. See Clayton Act, 15 U.S.C. § 15; Communications Act of 1934, 47 U.S.C. § 206; Interstate Commerce Act, 49 U.S.C. § 16(2).

Nor is there any basis for reaching a different conclusion with respect to counsel fees under Section 314(c) of the Federal Power Act. It provides that "[t]he Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission . . ." The legislative history bears out the only reasonable interpretation so clear on the

---

32. *See* page 420 and note 21 *supra.*

face of the statute: "Subsection (c) authorizes the Commission to employ such attorneys as it needs for *its* legal work." H.R.Rep. No. 1318, 74th Cong., 1st Sess. 34 (emphasis added).

Finally, petitioners rely on the Supreme Court's decision in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), which held that plaintiffs who successfully brought a derivative action under Section 14(a) of the Securities Exchange Act of 1934 were entitled to an award of costs, including counsel fees, against the corporation, even if the corporation recovered no money as a result of the action. Noting that the Securities Exchange Act did not provide for counsel fees, the Court based its decision on its equitable power to enforce the policies of the Act and to prevent unjust enrichment: "The dissemination of misleading proxy solicitations was a 'deceit practiced on the stockholders as a group,' J. I. Case Co. v. Borak, 377 U.S. [426], at 432 [84 S.Ct. 1555, at 1560, 12 L.Ed.2d 423], and the expenses of petitioners' lawsuit have been incurred for the benefit of the corporation and the other shareholders." 396 U.S. at 392, 90 S.Ct. at 625. Whether or not *Mills* could support such an award as petitioners seek without a more specific congressional mandate,[33] we do not find compelling need for it at this point, in view of our direction as to the role required of the Commission here.

Fully mindful that petitioners invoke our equitable powers, we cannot ignore parallel developments in this rapidly changing area of administrative law. As recently as December 7, 1971, the Administrative Conference of the United States refused to adopt a recommendation which would have endorsed the principle of reimbursing the legal expenses incurred by intervenors in administrative proceedings. The Conference, however, did adopt a recommendation which would oblige agencies to minimize filing and distribution requirements, to minimize the costs of obtaining transcripts, to make available the agency's technical files and to experiment with allowing access to their staff as advisers and witnesses. Recommendation 28, Public Participation in Administrative Hearings § D, adopted December 7, 1971. Without a showing of compelling need, it would be premature for us to inject the federal courts into this area of administrative discretion, perhaps foreclosing more flexible approaches through agency action or rules.

The petitions for review are granted in part and denied in part, and the case is remanded for further proceedings in accordance with this opinion.

---

33. *See* Note, The Allocation of Attorneys Fees after Mills v. Electric Auto-Lite, 38 U.Chi.L. Rev. 316, 329–330 (1971).