**CITIZENS FOR CLEAN AIR, INC., et al., Plaintiffs,**

v.

**CORPS OF ENGINEERS, UNITED STATES ARMY et al., Defendants.**

**No. 72 Civ. 2259.**

United States District Court, S. D. New York.

Feb. 15, 1973.

Jeffrey C. Cohen and Martin H. Redish, New York City, for plaintiffs.

Williams & O'Neill, New York City, for defendant Consolidated Edison Co. of New York, Inc., by Ernest J. Williams, Joel M. Lasker and Joyce P. Davis, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty., New York City, for defendants, except Consolidated Edison Co. of New York, Inc., by Samuel J. Wilson, New York City, of counsel.

GURFEIN, District Judge.

This matter involves the construction of a water intake and discharge facility for the cooling system of Consolidated Edison's (Con Edison) planned 800 megawatt fossil-fueled electrical generating plant known as Astoria No. 6 in the East River.

The detailed description of the project is set forth in the earlier opinion of Judge Lasker, 349 F.Supp. 696 (August 1 and 4, 1972). The Court was then called upon to review the sufficiency of administrative decisions in relation to the construction. The charge was that the Army Corps of Engineers (Army Corps) had failed to comply with the provisions of § 102(2)(C) of the Na-

tional Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C) because it had not evaluated the environmental effect of its permit for such construction. The plaintiffs sought a declaration that the permit was invalid. They also sought to enjoin all construction activity.

Judge Lasker granted summary judgment against the Army Corps for failure to comply with NEPA. He refused summary judgment against Con Edison stating that "unless plaintiffs meet their burden of showing that Con Ed is undertaking construction or intends to do so despite the absence of a valid permit, no summary judgment can be granted on the second cause of action."

With respect to injunctive relief against Con Edison the Court made the following order:

"6. Upon a balancing of the equities herein and considering the public interest involved in the subject matter of this action and the probable harm to the respective parties that would result from the granting or denial of injunctive relief, and, in particular, after reviewing the draft environmental statement now received from the Army Corps dated July 28, 1972, prepared under the provisions of Section 102(2)(C) of the National Environmental Policy Act (NEPA) for circulation as required, and upon concluding therefrom that the probable impact of Astoria No. 6 on the quality of water in the East River and air in the affected metropolitan area will be of markedly limited scope, the Court has determined and hereby orders that the plaintiffs' prayer for an injunction enjoining defendant Consolidated Edison from proceeding with its construction activities pursuant to the defendant Army Corps construction permit No. 8463, dated April 20, 1972, should be and the same is presently denied, without prejudice to plaintiffs' right to ap-

ply hereafter for such injunctive relief if the ordering provisions set forth below are not complied with, or in the event that defendant Army Corps shall conclude upon completion of the circulation of its statement on the environmental impact under Section 102(2)(C) of NEPA that the said construction and operation should not be permitted to proceed. Defendants Consolidated Edison and Army Corps are directed to proceed with due diligence to complete all action necessary to bring to a conclusion the processing and determination of defendant Conolidated Edison's [sic] application for a construction permit. The Court reserves jurisdiction to enforce compliance with the foregoing provisions of this paragraph and to grant such further relief as may be appropriate." 4 E.R.C. at 1466.

The plaintiffs now move for an order (a) enjoining Con Edison from proceeding with construction of these intake and discharge structures and enjoining the Army Corps from issuing any construction permit in connection therewith on the ground that the Army Corps' refusal to hold a public hearing on the environmental impact statement being prepared as a precondition to the issuance of any such construction permit pursuant to Judge Lasker's order is in violation of NEPA, the Army Corps Regulations and CEQ guidelines, and hence violates said order; and (b) modifying said order pursuant to Fed.R.Civ.P. 60 on the ground of newly discovered evidence; and (c) for other and further relief.[1]

Judge Lasker had before him a draft environmental statement prepared by the Army Corps relating to the "Application for Discharge Permit by Con Edison Unit No. 6, Astoria, New York." This document consisted of 133 pages of text with 27 pages of comments by interested agencies and an additional 51 fig-

---

1. Since Judge Lasker's order, an attempt to bring the matter before the Court of Ap- peals has been rejected and the appeal has been withdrawn.

ures and charts. The chapter headings illustrate the comprehensive nature of the draft statement: (1) Description of the proposed action; (2) environmental setting without the project; (3) environmental impact of the proposed project; (4) adverse effects which cannot be avoided; (5) alternatives to the proposed facility; (6) the relationship between local short term use of the environment and the maintenance cycle and enhancement of long term productivity; (7) irreversible and irretrievable commitment of resources; and (8) coordination with government agencies and civic groups.

Under the environmental impact of the proposed project the draft statement considered: (1) the impact of construction; (2) the impact of water-borne discharges on water quality standards with the physical, chemical and biological impact of water-borne discharges considered; (3) the impact of gaseous emissions, solid waste and oil spillage, the effect on recreational opportunities, the visual impact and traffic, the sound impact, and the impact on the urban environment.

It was in the light of this comprehensive draft statement and a balancing of the equities that Judge Lasker denied the injunction "concluding therefrom that the probable impact of Astoria No. 6 on the quality of water in the East River and air in the affected metropolitan area will be of markedly limited scope" (4 E.R.C. at 1466). He apparently assumed that Con Edison would do no more construction of the intake and discharge facility until a new construction permit was granted. There is said to be an urgent need of more electric power to supply New York City and to avoid "blackouts."

Since August 4, the date of Judge Lasker's order, the following events have occurred:

First, Con Edison has continued its construction work at its own risk, even though it does not yet have a construction permit.

Second, the plaintiffs requested the United States Attorney to notify them when the Army Corps intended to hold a public hearing "on its impact statement." The plaintiffs were officially informed that "the Corps contemplates no further hearing prior to the issuance of the final impact statement."

Third, the United States Environmental Protection Agency (EPA) made a comment on the draft statement on September 25, 1972, *after* Judge Lasker's order (Ex. A attached to motion); and the New York State Department of Environmental Conservation (DEC) also forwarded comments on the draft statement thereafter on October 10, 1972. (Some of these comments are challenged as to their validity by new affidavits from environmentalists in the employ of Con Edison.)

Fourth, the plaintiffs argue that Con Edison has now stated that the facility cannot, in any event, be completed before the Summer of 1975 rather than 1974, as previously stated, and that, therefore, the imposition of delay is less serious.

Fifth, although Con Edison has continued to construct without a permit, the Army Corps has sought no judicial relief.

Sixth, the Federal Water Pollution Control Act Amendments of 1972 (Public Law 92–500, 86 Stat. 816) were enacted October 18, 1972. The amendments transfer jurisdiction to grant permits for discharges into navigable waters from the Army Corps to the Administrator of EPA.

I

The defendants argue that since the order of Judge Lasker was not a "final judgment, order or proceeding" the newly discovered evidence provisions of Fed.R.Civ.P. 60(b) do not apply. While

that may be so, see 7 Moore's Federal Practice 2d ed. ¶60.20 (1972), the order specifically "reserved jurisdiction . . . to grant such further relief as may be appropriate." Under that fountainhead of jurisdiction new evidence may be considered on a later motion for injunctive relief. See John Simmons Co. v. Grier Bros. Co., 258 U.S. 82, 88, 42 S.Ct. 196, 66 L.Ed. 475 (1922); Marconi Wireless Telegraph Co. of America v. United States, 320 U.S. 1, 47, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943); Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858, 862 (5· Cir. 1970). The injunction, moreover, was denied without prejudice. The motion will be considered on its merits.

## II

On a review of the comments (Ex. 8 and 9) which are said to be "the new evidence" justifying injunctive relief I must decline to hold that such is their effect. It is my opinion that if these comments had been before Judge Lasker the "new evidence" would not have changed the result. The comments submitted by the environmental agencies post-decision are of a technical and scientific nature and have already triggered counter criticism of a scientific nature. It must be assumed that the Army Corps and EPA will give them careful consideration. That consideration is essentially an administrative rather than a judicial function. The Army Corps is now preparing its final environmental impact statement discussed below. The comments of the agencies, although too late to be included in the draft statement, will presumably be considered in the final statement. To ask a court to review each adverse comment by an agency and to determine its

weight as the criterion for injunctive relief would make of the judge an administrator. It would ascribe to him more scientific knowledge than he possesses. It would make of him an intermeddler in the serious business of environmental control. Regardless of our sympathy for a liberal interpretation of the environmental statutes the judicial function is limited to seeing that the procedural requirements of the statutes are scrupulously met and that after final agency review there will be judicial review under the applicable standards of the Administrative Procedure Act. Where NEPA procedures are met not much will remain for a reviewing court. City of New York v. United States (II), 344 F. Supp. 929, 940 (E.D.N.Y.1972). See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L. Ed.2d 136 (1971).[2] That does not necessarily detract from the general equitable power to abate nuisances where there is federal jurisdiction, but where Congressional action has provided an administrative process for the resolution of particular subjects, great respect must be paid to the presumptive exclusivity of that process.[3] The civil private remedy now provided in the Clean Air Act, 42 U.S.C. § 1857h, applies only to violations of emission standards and orders of the Administrator. We are not yet at that stage.

The September comment of EPA noted the imminent passage of the amendments to the Water Act and it essentially reserved its comments for the time when it would have taken jurisdiction over discharge permits. Its specific comments related principally to the suggestion that more consideration be given to other nearby discharges of heated affluents and to a further study of the syn-

---

2. We do not here meet the problem recently faced by the Court of Appeals in Hanly v. Kleindienst, 471 F.2d 823, (2 Cir., 1972) where the review was of whether a decision *not* to make an impact statement was proper. Here there will concededly be an impact statement in due course.

3. Some analogy may be found in two recent cases in the Supreme Court, Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973); and Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

ergistic effects of chlorine, low D.O. and high temperatures in combination. Finally, the comment letter requests that "a copy of the final E.I.S. on the project be forwarded to our office for review."

NYSDEC similarly suggested that additional information be obtained "relating to the environmental consequences of the proposed expansion, particularly with respect to air quality." With respect to water quality the NYSDEC generally concurred with the conclusions of the statement but was not convinced that biological sampling in the vicinity of the plant had been adequate.

As will be seen, these comments find us in the middle of the administrative process relating to air quality and at a stage with respect to water quality that is premature since the enactment of the 1972 amendments. Each of the comments, it should be noted, concerns the *operation* of the completed plant rather than the construction process itself.

### III

Two issues emerge therefore: (1) whether it is the business of the court to enjoin construction which is, in itself, not harmful to the environment in the absence of a request for action by the Army Corps, the agency charged with enforcement; and (2) whether a public hearing is required at this stage of the proceeding *before* the final environmental impact statement is prepared.

The argument for a court injunction stems from the natural feeling that there is no point to closing the barn door after the horse is stolen. The plaintiffs feel that there will be enormous pressure on whoever decides the environmental impact of the facility if the facility will have already been largely completed. They feel that the deciding authority will inevitably be affected by the realization that millions will have gone to waste if there is a last minute curb on the use of an already built plant. There is great merit to the point. On the other hand, Congress is feeling

its way in the environmental field and there is still a proliferation of authority. There is no one agency which pulls it all together and which actually takes into account long-range planning as well as the approval of specific sites and safeguards. See the provocative piece by Judge Irving Kaufman, "Power For The People—And By The People," 46 N.Y. U.L.Rev. 867 (1971). The fate of even this Astoria No. 6 project is now divided between the EPA for water quality and the Army Corps for air quality.

The plaintiffs certainly have the right to object to so unsatisfactory a solution. The narrower question is whether their redress is to the courts or to Congress. I think it is the latter. Federal regulation by injunction is not desirable, in any event. If construction, harmless in itself, is to be enjoined, upon what criterion of judgment is the injunction to be dissolved? The only answer lies in the legislation. The core of the legislation is the detailed impact statement which assumes its progression "through the existing agency review processes." (42 U.S.C. § 4332(2)(C)). And if these review processes accord with the standards of due process the courts should await their outcome no matter how desirable it might seem to get it over and done with.

There is the question, moreover, of whether a private citizen has standing to compel the cessation of construction without a permit when the Secretary of the Army has asked for no such relief. Law enforcement is generally left to the law enforcer. Connecticut Action Now, Inc. v. Roberts Plating Company, Inc., 457 F.2d 81 (2 Cir. 1972). There is, for example, no private right of injunction for discharging refuse in navigable water under the 1899 Act, 33 U.S.C. § 407. *Id.*; T. W. Guthrie v. Alabama By-Products, 456 F.2d 1294 (5 Cir. 1972); Tanner v. Armco Steel Corp., 340 F. Supp. 532 (S.D.Tex.1972); Lavignino v. Porto Mix Concrete Inc., 330 F.Supp. 323 (D.Colo.1971). And the Citizens suit now provided for in the Clean Air Act, as we have noted, has no relevance now. See 42 U.S.C. § 1857h.

■ ■ The plaintiffs contend that the avowed refusal of the Army Corps to hold a public hearing "prior to the issuance of its impact statement" is a violation of due process. The plaintiffs argue (1) that the public must be heard; (2) that the public view is meaningful only if it is made known *before* the final environmental impact statement is drawn. The argument is not without appeal. The difficulty with the argument is that, in the main, courts do not determine the rules of administrative procedure. It is the Congress which does. The courts enforce compliance with those procedures. See Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608 (2 Cir. 1965). In the case of the procedural requirement of EPA there is no statutory mandate that public hearings be held in every case where there is "major federal action significantly affecting the quality of the human environment" (42 U.S.C. § 4332). See Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275 (9 Cir., 1973).

Guideline 10(e) of the CEQ Guidelines provides (with relation to obtaining "the views of interested parties"): "Those procedures shall include, *whenever appropriate*, provision for public hearings. . ." (emphasis supplied). To be sure, if the Agency involved has its own requirements for public hearings like the Federal Power Commission, these requirements must be followed. Greene County Planning Board v. Feder-

al Power Commission, 455 F.2d 412 (2 Cir. 1972).

While the Army Corps' regulations do not require mandatory public hearings, we may assume, *arguendo*, that this remains an arguable point. There still remains the question of when the public hearing must take place, before the final environmental impact statement is filed or after it is filed and during the process of agency review.

The Ninth Circuit has recently held that there is no requirement for a public hearing before the final statement is prepared. The Court of Appeals said in *Jicarilla, supra*: "To hold in the abstract that meaningful public participation in the NEPA process cannot exist unless public hearings are held subsequent to the issuance of a draft environmental impact statement and prior to the preparation of the final document would be to substitute our judgment for that of Congress."

I believe that the thinking of our own Circuit is in accord. Our Court of Appeals in *Greene County, supra*, took the occasion to praise the rules of the Atomic Energy Commission which "prepares its final detailed statement, which is offered in evidence at a contested hearing." 455 F.2d at 422. The implication is clear that there is neither a statutory nor a due process reason for holding the public hearing before the final impact statement, the *single* statement required by the NEPA statute, is drafted.[4]

---

4. But *Cf.* Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693, 1972, 2 Cir., where it was said that the public hearing mandated by the Federal Aid to Highways Act, 23 U.S.C. § 128 would be "most valuable in aiding the agency in its preparation of the impact statement which we have today held is required by NEPA." The Court did not decide, however, that a public hearing must precede the final impact statement in a non-highway act case.

When the Court of Appeals instructed us that what was required of the agency was a "single coherent and comprehensive environmental analysis, which is itself

subject to scrutiny during the agency review process" it was referring to the final impact statement, the only statement required by statute, not to a draft. See Greene County Planning Board v. Federal Power Commission, *supra*, 455 F.2d at 420–421. Thus, under the new Atomic Energy Commission regulations in compliance with NEPA (see Calvert Cliff's Coordinating Committee, Inc. v. U. S. Atomic Energy Commission, 146 U.S.App. D.C. 33, 449 F.2d 1109 (1971), it is the final environmental impact statement which is part of the record and open to question. 10 C.F.R. § 50, App.D. at 249.

In the matter at hand the public had already expressed its views before the draft statement was prepared.

■ At this stage the Army Corps is preparing its *final* environmental impact statement. After that has been completed a decision will be made by the Secretary of the Army as to whether a further public hearing will be required. Since the Secretary may decide to hold such a hearing the application to compel such relief is premature and hardly presents a present case or controversy. Nor if a hearing is to be held is the form of such hearing now before the Court. See Murphy, "The National Environmental Policy And The Licensing Process," 72 Colum.L.Rev. 963 (1972).

There is no action pending in this Court against EPA which has now been vested with jurisdiction to issue permits for discharge into navigable water. Con Edison has applied for such permit. We are informed that the procedures for EPA to comply with the Amended Water Pollution Control Act by setting controlling standards will take until about October 1973 for New York State. It is hoped that, in the meantime, while the question of water pollution is in abeyance, the Army Corps will be in a position to move forward in its determination of the impact of Astoria No. 6 on air pollution and other environmental factors, exclusive of water pollution.

The foregoing timetable indicates that the parties are proceeding "with due diligence" and are not in violation of Judge Lasker's order.

The Court will reserve jurisdiction further to enforce compliance with the order and to grant such further relief as may be appropriate.

The motion to enjoin Con Edison from proceeding with the construction of the Astoria No. 6 plant, as to which it is assuming the entire risk of eventually being in non-compliance, is denied without prejudice.

It is so ordered.