Royal STEUBING et al., Plaintiffs,

v.

Claude S. BRINEGAR, Secretary of Department of Transportation, Raymond T. Schuler, Commissioner of New York State Department of Transportation, Albany, New York, Defendants.

Civ. No. 1973–576.

United States District Court,
W. D. New York.

May 20, 1974.

Richard J. Lippes, Buffalo, N. Y., for plaintiffs.

John T. Elfvin, U. S. Atty., Buffalo, N. Y. (C. Donald O'Connor, Asst. U. S. Atty., of counsel), for defendant Claude S. Brinegar, Secretary of Dept. of Transp.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, Albany, N. Y. (Douglas S. Dales, Jr., of counsel), for defendant Raymond T. Schuler, Commissioner of New York State Dept. of Transp.

CURTIN, Chief Judge.

## I. HISTORY OF THE LITIGATION

On November 23, 1973, the plaintiffs commenced this action seeking to enjoin

the defendants from continuing the construction of a bridge over Lake Chautauqua. Plaintiffs base their motion for a preliminary injunction on the theory that defendants have failed to comply with the requirements of the National Environmental Policy Act [N.E.P.A.], 42 U.S.C. § 4321 et seq., the Federal Aid Highway Act [F.H.W.A.], 23 U.S.C. § 101 et seq., the Clean Air Amendments of 1970, P.L. 91–604, 84 F.Stat. p. 1676, and the Department of Transportation Act, as amended, 49 U.S.C. § 1651 et seq. Plaintiffs' major allegations are that public hearings as required by the statutes were not held, that an Environmental Impact Statement [E.I.S.] as required by Section 102(2)(C) of N.E.P.A. was not filed, and that a similar statement as required by Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 1653(f), and by 23 U.S.C. § 138, was not filed. Defendants generally deny the allegations and also set out various affirmative defenses, including an allegation that the action is barred because of laches.

On January 17, 1974 an order of reference to United States Magistrate Maxwell was signed by United States District Judge John O. Henderson. The order of reference is as follows:

This matter having come on before this Court upon the application of plaintiffs for a preliminary injunction, and upon the motion of the defendant, Brinegar, for a hearing solely on the issue of laches and/or delay and the equitable considerations in connection therewith, and upon the agreement of the parties that such hearing is necessary, and good cause ·appearing therefor, it is

ORDERED: that this matter is hereby referred to United States Magistrate Edmund F. Maxwell, as special master, to hear and report with all due dispatch, the facts of this matter concerning the issue of laches and/or delay and the equitable considerations in connection therewith as they relate to the appropriateness of granting a preliminary injunction or dismissing this action.

Following Judge Henderson's death in mid-February 1974, the matter was referred to my part. Oral argument was heard on April 30, 1974 on confirmation of the Magistrate's report.

## II. THE MAGISTRATE'S REPORT

The Magistrate made two conclusions of law:

1. There has been no showing of unconscionable delay on the part of the plaintiffs, or such prejudice to the defendants, as to constitute laches.

2. The defense of laches should not apply in this.action.

The Magistrate also found:

It is thus recommended that plaintiffs' motion for a preliminary injunction be granted, pending a trial of the merits of this case. (Magistrate's Report at 27.)

Defendants objected to the Magistrate's report on three major grounds: (1) that the Magistrate erred in finding the date of May 9, 1973 (Plans, Specifications and Estimates approval) as the date on which plaintiffs had noticed that defendants would not comply with the law; (2) that the Magistrate erred in failing to consider the entire highway project instead of only the bridge; (3) that the Magistrate's recommendations on the preliminary injunction were beyond the scope of his authority.

In respects other than the objections noted, the defendants accepted the facts found by the Magistrate. Further proceedings were adjourned two weeks so that defendants could present further information on the Appalachian Commission, but nothing more was received by the court on May 13, 1974 except a joint stipulation of certain facts. Neither defendant desired any further evidence to be presented upon the question of whether a preliminary injunction should issue.

## III. LACHES

Defendants' disagreement with the Magistrate's finding that the defense of laches does not apply is based on two arguments: (1) that the time from which plaintiffs knew that their cause of action under N.E.P.A. and other relevant federal statutes accrued occurred prior to Plans, Specifications and Estimates [P.S. & E.] approval on May 9, 1973, and (2) that plaintiffs should be charged with notice that an action under N.E.P.A. accrued by taking into account the total project.

The Magistrate's findings of fact relevant to the question of laches are as follows:

In 1962, pursuant to New York State Highway Law, § 340–C, the general route of a highway designated as the Southern Tier Expressway was authorized. This highway was to run in a generally westerly direction from the Broome-Tioga County Line, near Binghamton, New York, a distance of approximately 250 miles to the Pennsylvania State line in Chautauqua County. The portion of the proposed highway which lies within Chautauqua County is approximately 35 miles long and is designated as Section 5. Section 5C includes the bridge spanning Chautauqua Lake from Stow to Bemus Point. This section is approximately 2.5 miles long and includes approximately .8 miles of structure over Lake Chautauqua and .18 miles over relocated Main Street and relocated Bemus Creek.

In August 1965, the concept of such bridge was approved by the United States Bureau of Public Roads (USBPR). In October 1965, the USBPR approved the Preliminary Location Plans and in November 1965, a public hearing relative to the construction of approximately 14 miles of the Southern Tier Expressway, including Section 5C, was held in the City of Jamestown, New York. In February 1966, the USBPR approved the transcript of the public hearing as satisfying the requirements of its Policy and Procedure Memorandum then in effect. In March 1966, the Appalachian Regional Commission designated the Southern Tier Expressway for inclusion in the Appalachian Regional Development Act Highway Program, the primary objective of the program being to promote the economic development of areas found by Congress to be significantly underdeveloped. In May 1967, the USBPR in a letter to the New York State Department of Public Works approved the location of the bridge to be constructed across the lake.

On January 1, 1970, NEPA was enacted into law.

On March 30, 1970, the USBPR authorized the commencement of negotiations for acquisition of a right of way in connection with Section 5C. On May 24, 1972, the Federal Highway Administration (FHWA), formerly the USBPR, granted Plans, Specifications and Estimates (PS & E) approval for contracts calling for the demolition of buildings on the rights of way encompassing Section 5C and portions of the bridge approaches located in Sections 5B (on the west side of Lake Chautauqua) and 5D (on the east side of Lake Chautauqua). These demolition contracts were awarded in June 1972, and the demolition work was completed in August 1972. Approximately 70 buildings were demolished and 20 families in Section 5C have been relocated. Construction of the bridge was planned in three phases: (1) demolition, which was completed in August 1972; (2) construction of the substructure of the bridge; and (3) construction of the superstructure of the bridge.

On May 9, 1973, the FHWA granted PS & E approval for construction of the bridge substructure. On July 9, 1973, a contract in the amount of $14,700,000 was awarded to Raymond International, Inc. for construction of the bridge substructure.

Between July 9, 1973, (the contract award date), and November 23, 1973,

(the date of commencement of this action), trees have been removed, land has been stripped, channel relocation work, dredging, and other general work preparatory to the driving of pilings and construction of the substructure has been done. Subsequent to November 23, 1973 and prior to January 17, 1974, one of a contemplated five test pilings was put in. As of December 14, 1973, the contract for the bridge substructure was approximately 3 percent complete (affidavit of Donald Ketchum, Regional Director, New York Department of Transportation, Exhibit S–2), and approximately $4.7 million has been spent on the project from 1962 to date. The present contract for the substructure calls for the installation of approximately 250 pilings and for completion of the substructure in June 1976. A contract for the superstructure of the bridge would be expected to be completed one to two years thereafter and, thus, according to present expectations, the bridge could carry traffic in 1977 or 1978. The total estimated cost of the completed bridge is about $29 million.

Magistrate's Report at 3–6.

■■■ The court finds that the Magistrate's finding that P.S. & E. approval was the critical date is a correct determination. "Plaintiff had no right, let alone obligation, to bring suit until the FHWA's sponsorship. . . . reached the point of a 'proposal for . . . major Federal action' within the ambit of . . . N.E.P.A., 42 U.S.C. § 4332(2)(C) . . . ." I–291 Why? Association v. Burns, 372 F.Supp. 223, at 234 (D.C.Conn.1974). In considering when a highway project has become federal for purposes of N.E.P.A., it is necessary to consider that in federal highway planning there are discrete stages and that federal approval is necessary at each stage: (1) a state's highway "system," (2) a particular highway location, (3) its design, (4) P.S. & E., (5) construction. See City of Boston v. Volpe, 464 F.2d 254 (1st Cir. 1972). "In all of

the cases in which a court found a highway to be federal, the federal government had at least granted location approval." Id. at 259. The Second Circuit has been even more specific as to when a highway project becomes federal. "[T]he federal government is not obligated to fund a particular project until the Secretary of Transportation has given P.S. & E. approval [citing 23 U.S.C. § 106(a)]." Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693, 699 (2d Cir. 1972). The court further finds that the delay between P.S. & E. approval (May 9, 1973) and the filing of this lawsuit (November 23, 1973) is not unreasonable. See City of New York v. United States, 337 F.Supp. 150 (E.D.N.Y.1972).

■■■ As to defendants' contention that the Magistrate should have considered other portions of the highway adjacent to the bridge in making his determination, the weight of case law in this circuit is to the contrary. See Monroe County Conservation Council, Inc. v. Volpe, supra (construction of 14.25 miles connecting two completed segments, totalling 16 miles of Rochester Outer Loop enjoined pending preparation of E.I.S.) ; I–291 Why? Assoc. v. Burns, supra ("this [$15,000,000.] figure for Connecticut's general expenses in connection with I–291 cannot fairly be weighed against plaintiff in considering the applicability of laches."). See also Greene County Planning Bd. v. Fed. Pow'r Comm., 455 F.2d 412 (2d Cir. 1972).

For the reasons enunciated herein as well as those given in the Magistrate's Report, the determination that the defense of laches does not apply is hereby adopted.

## IV. PRELIMINARY INJUNCTION

Again, the court notes that no party desired to present any further evidence on the question of whether a preliminary injunction should issue. Defendants sunstantially accepted the findings of fact made by the Magistrate, with certain objections the court shall consider. However, defendants objected to the

Magistrate's recommendation that a preliminary injunction should issue as beyond the scope of his authority as delineated in the order of reference. For purposes of discussion, the court assumes that the Magistrate's recommendation that a preliminary injunction should issue was beyond the grant of his authority.[1]

Therefore, the court shall review the facts which the Magistrate found on the preliminary injunction issue that are substantially uncontroverted and shall consider, relying on all sources (proposed findings of fact, memoranda of law, transcripts of the hearing before the Magistrate and oral argument before the court), defendants' objections to those findings.

 The standard for the granting of a preliminary injunction is a two-prong test: there must be a showing of probable success on the merits and proof of irreparable harm to those seeking the injunction. *See* Gulf & Western Industries v. Great Atlantic & Pacific Tea Co., Inc., 476 F.2d 687 (2d Cir. 1973).

The Magistrate's Report included the following on the underlying facts significant to the determination of injunctive relief:

### A. *The Probability of Success on the Merits*

Admittedly, no EIS, as such, was prepared by any Federal agency. In 1971, an "Environmental Reevaluation" (Exhibit S–5) was prepared by the NYSDOT and approved by the FHWA. This document consists primarily of correspondence among the NYSDOT, its engineering consultants, and the FHWA, relative to the construction of the bridge, but also includes records of the fears raised by the State Department of Environmental Conservation and of conferences relative to environmental problems.

In March 1973, the NYSDOT submitted an "Environmental Reevaluation Supplemental Report" (Exhibit S–6), and this document was approved by the FHWA on April 16, 1973. It deals with engineering aspects as well as the socio-economical and environmental impact of the bridge.

The pertinent section of NEPA relating to the necessity of an EIS is Section 102 (42 U.S.C. § 4332) which states in part as follows:

> "The Congress authorizes and directs that, *to the fullest extent possible*: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) *all agencies of the Federal Government shall . . . .* "

. . . . .

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the *responsible* official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

"Prior to making any detailed statement, the *responsible Federal official*

---

1. Although the court believes there is a strong argument in favor of the plaintiffs' position that the Magistrate's recommendation that a preliminary injunction should issue was within his authority, *see* Order of Reference, *supra*, the court has made the opposite assumption so as to avoid the "clearly erroneous" standard accorded to the findings of a special master. *See* Fed.R. Civ.Proc. 53(e)(2).

shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;"

(emphasis supplied)

In Greene County Planning Board v. Federal Power Commission, *supra.*, the court held that the "primary and nondelegable responsibility" for fulfilling the function of Section 102(2)(C) lay with the Federal agency and that:

"The Federal Power Commission has abdicated a significant part of its responsibility by substituting the statement of (the State agency) for its own." (455 F.2d at p. 420)

See also Conservation Society v. Secretary of Transportation [362 F.Supp. 627], 5 ERC 1683 (Dist.Vt., July 26, 1973) and I–219 Why? Association v. Burns, *supra.*, at page 49 of the court's decision. Furthermore, there is nothing in the record of this hearing to indicate that the required Federal interagency consultation relative to environmental impact was had or that the other requirements of Section 102(C) were met.

As to the defendants' allegation that an EIS was not required because of "design approval" before February 1, 1971, as previously stated, there is a serious question as to whether "design approval" was in fact granted before February 1, 1971. Even if such were to be conceded, the Monroe County v. Volpe case, *supra.*, would require an EIS on any project wherein PS & E approval was not given

prior to the effective date of NEPA. In Arlington Coalition v. Volpe, (CA 4 1972) 458 F.2d 1323, 3 ERC 1995, the court held that the requirements of Section 102(c) would be applicable to a project in progress on the effective date of NEPA until that stage of progress had been reached where:

" . . . the costs of altering or abandoning the project could so definitely outweigh whatever benefits that might accrue therefrom that it might no longer be 'possible' to change the project in accordance with Section 102." (p. 1331)

The court further stated at page 1332:

"Manifestly the date of design approval alone does not accurately measure whether Arlington I–66 has reached the crucial stage, and determining the applicability of Section 102(c) by this standard alone would be arbitrary and capricious agency action and an abuse of administrative discretion."

It thus seems reasonable to believe that based on the record herein there has been a showing of probable success on the part of the plaintiff.

### B. *The Showing of Irreparable Harm*

At the time of the hearing, according to the testimony, one test piling of a contemplated 250 pilings had been driven and the construction of the bridge substructure contract was approximately 3 percent complete.

If no injunction were to issue, it is reasonable to assume that by the time a final determination of the issues on their merits has been made, the construction will have reached that stage of completion wherein for economic reasons, it would be impossible to turn back or alter the work and thus the environment might be irreparably affected. The State Department of Environmental Conservation expressed this fear in its letter of December 16,

1970, (Exhibit S–5), when it stated: "The ecology of Chautauqua Lake could be disrupted both during and after construction . . . ."

As has been stated by the attorneys for the parties, the issue in this lawsuit is not whether the bridge should be built, but instead, whether there has been proper compliance with the procedural requirements of NEPA. The determination as to completion of the bridge is to be made by the appropriate State and Federal agencies, in compliance with the law and, if it is determined that an EIS is required, upon a weighing of all of the factors raised by that statement, including the economic needs as well as the environmental requirements of the public. It may well be that upon completion of the EIS the responsible agencies will be fully satisfied that the environment is being protected and that the bridge should proceed to completion as planned. But it would better serve the public if that protection were assured prior to continuation of construction, when possible changes in protection of the environment can be accomplished.

Magistrate's Report at 22–27.

Defendants' objections to these findings of fact may be characterized as objections of omissions. Defendants assert that (1) the total highway project surrounding the bridge should be considered, and (2) private monies expended in the private sector in reliance that the total project would be completed on time. That no Environmental Impact Statement as defined in N.E.P.A. was prepared by any federal agency is admitted. In the court's opinion, this admission is critical. The court refuses, as a matter of law, to give weight to either the total highway project or the private reliance upon the bridge's completion. *See* N.E.P.A., 42 U.S.C. § 4332(2)(C); Greene County Planning Bd. v. Fed. Pow'r, Comm., *supra*; Monroe County Conservation Council, Inc. v. Volpe, *supra*.

A preliminary injunction against further construction of the Chautauqua Lake Bridge (parcel "5C") pending compliance with N.E.P.A. shall issue forthwith. Defendants may complete the driving of the five test pilings. If other work is necessary to shut the project down while the necessary environmental impact study is being made, the defendants may move upon notice for further relief.

So ordered.