Royal STEUBING et al.,
Plaintiffs-Appellees,

v.

Claude S. BRINEGAR, Secretary of Department of Transportation, and Raymond T. Schuler, Commissioner of New York State Department of Transportation, Albany, New York, Defendants-Appellants,

Thom Shagla et al., and County of Chautauqua, Intervenors.

Nos. 278, 336, Dockets 74–1911, 74–2162.

United States Court of Appeals, Second Circuit.

Argued Oct. 31, 1974.

Decided Feb. 13, 1975.

Richard J. Lippes, Buffalo, N. Y. (Sargent & Lippes, Buffalo, N. Y., on the brief), for plaintiffs-appellees.

Eva R. Datz, Dept. of Justice, Washington, D. C. (Edmund B. Clark, Dept. of Justice, Washington, D. C., Wallace H. Johnson, Asst. Atty. Gen., John T. Elfvin, U. S. Atty., Buffalo, N. Y., C. Donald O'Connor, Asst. U. S. Atty., Buffalo, N. Y., on the brief), for Claude S. Brinegar, defendant-appellant.

Douglas S. Dales, Jr., Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. of N. Y., Ruth Kessler Toch, Sol. Gen., on the brief), for Raymond T. Schuler, defendant-appellant.

Norman J. Landau, New York City (Paul D. Rheingold, New York City, on the brief), for Thom Shagla et al. and County of Chautauqua, intervenors.

Debevoise, Plimpton, Lyons & Gates, New York City, on the brief of amicus curiae, The Environmental Defense Fund.

Before LUMBARD, MOORE and MANSFIELD, Circuit Judges.

LUMBARD, Circuit Judge:

This is an appeal from the entry of a preliminary injunction on May 20, 1974, by Chief Judge Curtin in the Western District, against Claude S. Brinegar, Secretary of the United States Department of Transportation, and Raymond T. Schuler, Commissioner of the New York State Department of Transportation, enjoining construction of a federally-funded expressway bridge over Lake Chautauqua in Western New York pending preparation and filing of an Environmental Impact Statement (EIS) pursuant to section 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C).[1] Steubing v. Brinegar, 375 F.Supp. 1158 (W.D. N.Y.1974). Appellants do not seriously contend that NEPA was complied with. Instead they argue that the issuance of the injunction pending compliance was improper because plaintiffs delayed in bringing the action, because the bridge and adjacent highway sections are allegedly at advanced stages of planning

---

1. § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts.

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

.   .   .   .   .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes   .   .   ..

or construction, with substantial sums having been spent thereon, and because delay would result in substantially increased costs. We affirm.

## I. Background.

The proposed bridge over Lake Chautauqua is intended to be part of the Southern Tier Expressway, first authorized by the State of New York in 1962 to run 250 miles from the state line near Erie, Pennsylvania, east to the Broome-Tioga County Line near Binghamton, New York.[2] "Section 5" is a 35-mile section in Chautauqua County at the western end of the highway, with Section 5C consisting of a 2.5-mile segment running from the town of Stow east across Lake Chautauqua to Bemus Point. Lake Chautauqua itself is over eighteen miles long and shaped like an "L". The bridge, over four-fifths of a mile long and estimated to cost over $29 million, is designed to cross the lake at its narrow midpoint, near where the southern half of the lake swings to the east. East of the bridge and Bemus Point the expressway will run north of and roughly parallel to the lower half of the lake and just north of the town of Jamestown which is located at the southeastern end of the lake. An alternative route running south of the lake from Jamestown was rejected early even though it was only five miles longer. Apparently one reason for that rejection was that an expressway from Jamestown to Bemus Point was going to be built for local traffic, even if there were no bridge. Thus extending that section across the lake and including it as part of the Southern Tier Expressway would require that fewer total miles of highway be built. Moreover, it would provide a crossing for local residents, where only a ferry now runs. The Southern Ex-

pressway, whether across or around Lake Chautauqua, was considered important to the economic growth of this part of the state.[3] Indeed in 1967 the Southern Tier Expressway was designated for inclusion in the Appalachian Regional Development Act Highway Program, which was intended to promote economic growth in areas found by Congress to be underdeveloped.

Federal involvement in the proposed Lake Chautauqua Bridge project began prior to the effective date of NEPA (January 1, 1970), but the basic facts found below leave no question but that an EIS should have been prepared in accordance with section 102(2)(C). Section 102 requires that federal agencies implement NEPA to the "fullest extent possible." As of January 1, 1970, the United States Bureau of Public Roads (USBPR) had approved the concept and the location of the bridge, and may have approved its design,[4] but no federal money had been committed to the construction of the bridge as then designed and tentatively located. No construction contracts had been let, as not even the right of way for the approaches had been acquired. In addition, adjacent sections of the expressway were largely unbuilt, with the rights of way only recently acquired, and an alternative route south of the lake remained a viable possibility.[5] In these circumstances subsequent decisions by the USBPR and its successor, the Federal Highway Administration (FHWA) approving final plans and committing federal funds for construction of the bridge, constituted major federal actions requiring preparation of an EIS. See, e. g., Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693 (2d Cir. 1972); Arlington Coalition on Transportation v.

2. N.Y. Highway Law § 340–c (McKinney's Consol.Laws, c. 25, Supp.1973).

3. The need for such a highway must have been met in part by the completion of I–80 across northern Pennsylvania 1972.

4. Appellants claim design approval occurred on October 31, 1968 or October 7, 1969. However, the special master stated that there

was some question whether it might have occurred as late as February 1, 1971.

5. It should also be noted that Pennsylvania had not yet undertaken the planning and construction of a connecting link between the western end of the Southern Tier Expressway at the New York-Pennsylvania line and a major highway in Pennsylvania.

Volpe, 458 F.2d 1323 (4th Cir.), cert. denied, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972).[6] An EIS might well have pointed out potential environmental savings well worth the cost involved in altering the design, location, or construction methods for the bridge, or even in rerouting the highway south of the lake and abandoning the plan for the bridge altogether.

Nevertheless, an EIS was not prepared. In March 1970, Plans, Specifications, and Estimates (P.S. & E.) approval was granted by the USBPR authorizing New York to acquire the rights of way for the approaches to the bridge. P.S. & E. approval marks the point at which the federal government finally commits funds for specified purposes.[7] On May 24, 1972, the FHWA granted P.S. & E. approval for contracts to demolish buildings located on the approaches to the bridge. Demolition of approximately seventy buildings and relocation of twenty families were completed that August. On May 9, 1973, the FHWA granted P.S. & E. approval for construction of the bridge substructure, and a $14,700,000 contract was awarded to Raymond International, Inc. on July 9, 1973. Work commenced soon thereafter.

Plaintiffs brought this suit on November 23, 1973, charging, inter alia, that no EIS had been filed and seeking injunctive relief against further construction of the bridge substructure pending compliance with NEPA.[8] Pursuant to the stipulation of the parties, the matter was referred to a special master, Magistrate Edmund F. Maxwell, for findings of fact with regard to the defense of laches and the equitable considerations relating to preliminary injunctive relief.

The special master found that as of December 14, 1973, the bridge substructure contract was only three percent complete. Although the final substructure was to consist of approximately 250 pilings, only one of five test pilings had been implanted in the lake bed. The work which had been done was largely preparatory, including the removal of trees and the stripping of some land along the approaches, as well as some dredging and channel relocation.

With regard to the other segments of highway in Section 5, the master found that they were at various stages of construction. Section 5B (10 miles long), immediately west of the bridge, had not yet received design or P.S. & E. approval (although the right of way had been acquired and some buildings removed), and an EIS was being prepared. Section 5A (10 miles long), which was west of 5B, was completed but for the paving.[9] East of the bridge the right of way for Section 5D (Bemus Point to Jamestown—six miles) had been acquired, some buildings had been demolished, and a construction

---

**6.** In their decision not to prepare an EIS, appellants apparently relied upon PPM 90–1 (FHWA Guidelines for Implementing Section 102(2)(C) of the National Environmental Policy Act of 1969 [and other acts], August 24, 1971), as well as interim guidelines promulgated in November 1970, which suggested that no EIS was required where design approval occurred prior to January 1, 1970. However, Congress provided that NEPA be implemented to the "fullest extent possible," and these agency guidelines do not excuse the failure of the USBPR and the FHWA to prepare an EIS in this case, even assuming that design approval occurred in 1968 or 1969. See Arlington Coalition on Transportation v. Volpe, supra, 458 F.2d at 1332. See also I–291 Why? Association v. Burns, 372 F.Supp. 223, 235–36 (D.Conn.1974); Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731, 735–39 (D.Conn.1972); Conservation Society of

Southern Vermont, Inc. v. Volpe, 343 F.Supp. 761, 765–768 (D.Vt.1972). Contra, Robinswood Community Club v. Volpe, 506 F.2d 1366 (9th Cir., 1974), 4 Env.L.Rptr. 20378, pet. for reh. denied (Dec. 23, 1974).

**7.** Monroe County Conservation Council, Inc. v. Volpe, supra, 472 F.2d at 699.

**8.** Plaintiffs also alleged that the defendants had failed to comply with the requirements of the Federal Highway Act, 23 U.S.C. §§ 101 et seq., the Clean Air Amendments of 1970, 42 U.S.C. §§ 1857 et seq., and the Department of Transportation Act, 49 U.S.C. §§ 1651 et seq. In ordering preliminary relief based on NEPA, the special master and the district court did not consider these other claims.

**9.** Section 5A had been built wholly with State funds.

contract was in the process of being awarded. The master noted that there was testimony and evidence that if a bridge were not built, some or all of Sections 5A and 5B might be salvaged if an alternate route were found. Moreover, Section 5D would be used in any event.

The state alleged that as of the date of the hearing, January 14, 1974, it had spent $4.7 million on Section 5C. Of this money, the state had spent approximately $2.8 million prior to May 1973, the date of P.S. & E. approval for the bridge substructure; $1 million between that date and the institution of the lawsuit; and $1.9 million since that time. Moreover, the state alleged that the cost of shutting down construction for seven months would be $1.8 million, and the cost of cancelling the substructure contract and later reletting it (assuming a delay of over two years) would be $2.8 million. Substantial parts of these latter figures were due to anticipated inflation. At a post-hearing conference attended by all parties, the state indicated that the cost of any delay would be considerably lessened if the court permitted it to complete five test pilings. Apparently the state expected that it could determine from the test pilings the necessary specifications for the main pilings and then have them manufactured during any court-ordered delay.

The special master found that plaintiffs' claim should not be barred because of their delay in bringing this action. He held first that laches should not be applied because of the nature of the suit, but if that defense were to be considered, then plaintiffs' delay was most reasonably measured from May 1973, the date of P.S. & E. approval for the bridge substructure. Up to that point federal officials were not finally committed to funding the bridge substructure and could have delayed approval pending preparation and consideration of an EIS. Plaintiffs, he found, had not delayed un-

reasonably from that date. He also recommended that a preliminary injunction issue pending a trial on the merits. He found that the project was still at a stage where substantial environmental savings might result from preparation of an EIS. Given the agency's apparent violation of NEPA, he recommended preliminary relief lest, by the time an EIS is prepared, the project reach a stage where irreparable environmental damage would have been done or where for economic reasons it would be infeasible to alter the project in light of the EIS. The master did recommend, however, that the state be allowed to complete the five test pilings prior to any work stoppage.

On May 20, 1974, having given the parties an additional opportunity to present evidence on the question of whether a preliminary injunction should issue and all of them having declined, the district court affirmed the special master's findings on the issue of laches and held that a preliminary injunction should issue against further construction pending compliance with NEPA. However, the court permitted the state to complete the five test pilings. The parties also stipulated that the state would complete certain construction necessary to protect the work already performed, to reestablish local services, to protect surrounding real property, and to prevent environmental damage. This appeal followed.[10]

## II. Laches.

Appellants' initial argument for reversal is that the delay of these plaintiffs in bringing this suit should have barred injunctive relief because of the doctrine of laches. In particular they claim that the district court erred in measuring plaintiffs' delay from May 1973 rather than May 1972, the date of P.S. & E. approval for demolition of the buildings on the bridge approaches. We disagree.

---

10. On appeal, this court permitted a group of local residents and the County of Chautauqua to intervene on the side of appellants. The

Environmental Defense Fund filed an amicus brief in support of the district court's action.

To be sure, plaintiffs could have brought this suit earlier and thus reduced to some degree the costs which the state, the federal government and even private parties may incur as a result of delay pending preparation of an EIS. But we do not believe that any delay attributed here to the plaintiffs should bar injunctive relief. Plaintiffs are attempting to effect compliance by public officials with duties imposed by Congress under NEPA. Given the strong public interest in effecting such compliance, the primary question is not how much earlier plaintiffs should have sued, but whether injunctive relief pending compliance would still serve the public interest and the purposes of the Act.[11] This is not to say that a plaintiff's delay can have no effect on a determination of whether injunctive relief is appropriate. During delay construction may have proceeded to a point where any significant environmental damage has already been done. Alternatively, construction may have gone so far that for economic reasons it would be impracticable or impossible to alter much of the basic plan. However the policy behind NEPA that federal agencies implement the act to the "fullest extent possible" means that plaintiffs' delay in bringing a suit should not prevent a court from enjoining construction pending compliance if it appears that such a stay would best serve the public interest.

Moreover, we cannot disagree with the conclusion of the special master that May 1973 was the appropriate date from which to measure plaintiffs' delay. The special master found that there was no question but that plaintiffs were long aware of the fact that a bridge was contemplated and were, or should have been, aware in the summer of 1972 that buildings were being demolished in contemplation of construction. But it was not until the summer of 1973 that preparations for the bridge began in earnest, with the stripping of land and the removal of trees along the approaches, and with some dredging, channel relocation, and construction of the first test piling. Such positive developments are usually required to galvanize opposition to a project such as this bridge and to motivate a group of citizens to hire a lawyer to see if there is a legal basis for challenging all, or part of, the proposed construction. I–291 Why? Association v. Burns, 372 F.Supp. 223, 237 (D.Conn. 1974). Such citizen groups play a key role in policing agency compliance with NEPA.

The plaintiffs had a right to assume that federal officials would comply with applicable law. To be sure plaintiff Steubing had been told by state officials in March 1972 that no EIS was being prepared and that none was required by applicable law. But as a layman, he must not be penalized too greatly for relying in the first instance on this representation and instead seeking legislative action, which proved unsuccessful. In weighing the equities in relation to a defense of laches, the special master quite appropriately considered that federal highway officials were put on notice by court decisions in 1972[12] that they could not continue to justify their failure to prepare an EIS merely on the ground that design approval occurred prior to the effective date of NEPA. On April 16, 1973, federal officials, urging the state to act promptly, wrote:

> "As you are aware, the procedures of PPM 90–1 have recently been challenged, and there is a very good possibility that Environmental Impact Statements may be required prior to P.S. & E. approvals for *all* projects in the near future."

However, the federal officials chose to take no steps toward the formulation of an EIS.

[4] Finally, the special master quite properly took into account the fact that

---

11. See, e. g., Arlington Coalition on Transportation v. Volpe, supra, 458 F.2d at 1329–34.

12. See Monroe County Conservation Council, Inc. v. Volpe, supra; Arlington Coalition on Transportation v. Volpe, supra; Committee to Stop Route 7 v. Volpe, supra; Conservation Society of Southern Vermont, Inc. v. Volpe, supra.

plaintiff was representing the public interest in securing compliance with NEPA and that because the bridge was such a large project and in such an early stage of construction, the possible environmental savings resulting from requiring an EIS seemed to outweigh the detriment defendants and third parties might suffer as a result of any delay on the part of plaintiffs in bringing this action.

We thus affirm the district court's approval of the finding of the special master that the plaintiffs' alleged delay in bringing the suit should not be determinative of whether preliminary injunctive relief was appropriate.

III.   Preliminary Injunctive Relief.

Appellants argue that the issuance of injunctive relief was not warranted in the circumstances of this case.

■■■ The district court correctly found that plaintiffs had established a probability of success on the merits in showing that NEPA had not been complied with. The project had been at a sufficiently early stage of completion in January 1970 that there was no justification whatsoever for not filing an impact statement. Monroe County Conservation Council, Inc. v. Volpe, supra; Arlington Coalition on Transportation v. Volpe, supra. Appellants point out that two state reports, required under applicable law prior to NEPA, had been "approved" by the FHWA in 1971 and 1973, and dealt to some degree with the environmental problems expected to be encountered from construction of the bridge. In addition, one public hearing, dealing with the location of the bridge (although not its design), had been held in 1965. But this hardly constitutes substantial compliance with NEPA. As the master and the district court noted, the responsible federal agency has a "primary and nondelegable responsibility" to make its own comprehensive and objective evaluation of the environmental impact of a project

constituting a major federal action. Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, 508 F.2d 927 (2d Cir. 1974); Greene County Planning Board v. FPC, 455 F.2d 412 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). In addition, the responsible federal agency is required by section 102 to consult with other federal agencies relative to the environmental impact of such a project, but there is no evidence that that was done here. The limited hearing in 1965 and the two reports prepared by the state after design and location approval had been obtained from the USBPR cannot be considered a suitable substitute for the statement which the statute requires the responsible federal agency to prepare.

■■■ The record also supports the finding of the district court that there was an adequate showing of probable irreparable injury. The substructure contract was only three percent complete. Only one test piling had been driven, yet the final structure would contain 250 such pilings and stretch over four-fifths of a mile of water. Construction of the bridge would leave a lasting imprint on Lake Chautauqua, which is one of western New York's largest and most beautiful lakes. The state did take steps it thought would minimize the disruption to the environment that the actual construction process would cause, once the state Department of Conservation expressed fears that the bridge (especially the construction process) would disrupt the ecology of the lake and adversely affect the recreational, esthetic, and economic resources of the immediate and surrounding area. But given that the bridge is at such a very early stage of construction, we believe that the district court was justified in concluding that substantial environmental damage could or would result from the bridge, and that construction should not proceed without a more comprehensive environmental study and a more careful consideration of the alternatives still open.[13]

13.   Appellants argue that the district judge erred when he said that he would not con-

sider "the total highway project." However, we feel that his decision was entirely appro-

Without preliminary injunctive relief construction might well reach the stage of completion where for economic and other reasons it would be impossible to turn back or alter the project in light of what an EIS revealed, and thus the environment might thereby be irreparably damaged.[14]

■■ Finally, despite the substantial additional costs which would be caused by court-ordered delay, we find no error in the conclusions of the district court and the special master that the public interest would be best served by the preliminary injunction. First, many of the costs cited by appellants are predicated on the assumption that the bridge will not be built. That, however, is not the issue in this case. The EIS is directed not only at consideration of alternative routes, but at ameliorating environmen-

tal harm if the bridge is in fact built. Funds already spent and construction already done will still be factors when the agencies consider whether changes should be made in light of what the EIS reveals. Second, compliance with NEPA invariably results in delay and concomitant cost increases, and Congress has implicitly decided that these costs must be discounted.[15] Moreover, in this case any additional costs resulting from delay now rather than before P.S. & E. approval are largely self imposed because the defendants were aware in 1972, long before this suit was brought, that an EIS might well be required for this project, yet they chose not to prepare any such statement.[16]

Accordingly, the order of the district court is affirmed.

---

priate in the circumstances of this case. Monroe County Conservation Council, Inc. v. Volpe, supra, 472 F.2d at 698–99. Consideration of the other sections of the highway could not minimize the environmental impact the bridge will have. During any delay in construction of the bridge traffic can still go around the lake, or across it on the ferry when the lake is not frozen. Moreover, the special master found that construction on section 5B had not yet begun, that section 5D would be used even if the bridge was not built, and that sections 5A and 5B could be salvaged even if an alternate route were eventually selected.

14. The situation in this case can be contrasted to that in Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, supra, where this court upheld the denial of an injunction against further construction of the Sleeper's River interchange in St. Johnsbury, Vermont, even though an inadequate EIS had been filed. In that case the district court had found that the interchange was at an advanced stage of construction, that the alternative proposals for the interchange were "impossible to realistically implement because of adverse terrain," that the affected resource was not so "environmentally unique" as to require any "special consideration," and that "extensive and thoughtful evaluation" had been given to mitigating the adverse environmental consequences of the project. In addition, without the interchange St. Johnsbury would have an intolerably

heavy traffic burden, and the area would have a higher unemployment rate. The court also took note of Vermont's extremely short construction season. See also Greene County Planning Board v. FPC, supra, 455 F.2d at 424–25 (power lines 80% complete).

15. Greene County Planning Bd. v. FPC, 455 F.2d 412, 422–23 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); Calvert Cliffs' Coordinating Comm. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1122 (1971). Another direct result of NEPA-caused delays that Congress undoubtedly was aware of, is that the jobs created by a construction project might be interrupted and that the initial employment of some persons might be postponed.

16. Appellants also argue that the court erred in failing to consider that private parties had made investments on the assumption that the bridge would be built. For example, a school was constructed west of the lake in 1970, as was the new work headquarters of a local utility. Since these projects were completed prior to the completion of the bridge, its existence must not have been absolutely vital to the projects. In any event, these private expenditures were made subject to the risk that the bridge might not ever be completed as a result of state or federal decisions. We agree with the special master that any such costs were outweighed by public interest considerations.